**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| NADIMKHAN PATHAN,<br><br>              Plaintiff,<br><br>  v.<br><br>STATE OF CONNECTICUT, POLICE<br>OFFICER STANDARDS & TRAINING<br>COUNCIL; and STATE OF<br>CONNECTICUT DEPARTMENT OF<br>ENVIRONMENTAL PROTECTION,<br><br>          Defendants. | 3:10-CV-00013 (CSH) |

**RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**HAIGHT**, Senior District Judge:

I.      **Introduction**

      This is an employment discrimination case.   Plaintiff Nadimkhan Pathan[1] (hereinafter

"Plaintiff"), charges Defendants State of Connecticut Police Officer Standards & Training Council

---

    [1]   Plaintiff states in his August 10, 2011 deposition that he brought this lawsuit under the name "Nadimkhan Pathan," the name by which he at least sometimes went in India.  He states, however, that his school certificate and passport refer to him as "Nadeemdadkhan Pathan," and indicates that both first names – i.e., Nadimkhan and Nadeemdadkhan – are correct.  *See* [Doc. 43-5] at 8-9.  For consistency, Plaintiff will be referred to in this Ruling by the name under which he has brought the action, i.e., "Nadimkhan Pathan."  However, certain pieces of evidence which the Court quotes within this Ruling refer to Plaintiff as "Nadeemdadkhan Pathan"; the Court will not alter such spellings when directly quoting from those documents.

and State of Connecticut Department of Environmental Protection[2] (hereinafter collectively "Defendants") with discriminating against him because of his race, national origin, and religion in violation of Title VII of the Civil Rights Act of 1964 as amended by the Civil Rights Act of 1991. *See* [Doc. 1]. Specifically, the Complaint contains three counts: (1) racial discrimination in violation of Title VII of the Civil Rights Act of 1964 as amended by the Civil rights Act of 1991; (2) national origin discrimination in violation of the same; and (3) religious discrimination in violation of the same. *Id.* Plaintiff "prays for appropriate compensatory damages including: damages for back pay; front pay; bonuses; personal days; lost pension benefits; emotional distress; consequential damages; punitive damages; reasonable attorneys' fees; costs; interest; job reinstatement; for an injunction requiring the removal of any and all adverse information contained in plaintiff's personnel file; for a trial by jury; and for all other just and proper relief." *Id.* at 12.

Defendants deny all liability, and have moved for summary judgment. *See* [Doc. 43]. They contend: (1) that Plaintiff cannot prevail on a Title VII claim against the State of Connecticut Police Officer Standards & Training Council  (hereinafter "POST") because Plaintiff "did not have an employer-employee relationship with POST for Title VII purposes;" (2)  that both Defendant State of Connecticut Department of Environmental Protection (hereinafter "DEP") and Defendant POST "have met their burden of articulating legitimate, non-discriminatory reasons for their actions;" and (3) that Plaintiff "is unable to demonstrate pretext with regard to either [D]efendant." [Doc. 43-2] at 3.  Plaintiff filed an objection to Defendants' Motion for Summary Judgment, *see* [Doc. 50], and

---

[2]  Defendants advise the Court that, "[a]s of July 1, 2011, the Department of Environmental Protection [was] involved in an agency consolidation with the newly[] created Department of Energy and Environmental Protection." [Doc. 43-2] at 1.  For the purpose of consistency within this Ruling, the Court will refer to this Defendant as the Department of Environmental Protection or "DEP."

Defendants have filed reply briefs thereto.  *See* [Doc. 57] and [Doc. 59].  The summary judgment motion is therefore ripe for adjudication, and the Court now rules upon it.

## II.    Background

Plaintiff, who describes himself as a Muslim Asian with an Indian national origin, *see* [Doc. 1] at ¶¶ 8-10, states in his Complaint that he "was employed by [D]efendant State of Connecticut Department of Environmental Protection and[,] as a part of his employment[,] attended [D]efendant State of Connecticut Police Officer Standards & Training Council's police academy."  *Id.* at ¶ 11. His employment with DEP became effective March 16, 2007 when he became a Protective Services Trainee in Conservation Enforcement for the Department. [Doc. 46-9] at 25.  Plaintiff was "required to serve a twelve-month working test period," which fully encompassed his time at the POST academy.  *See id.*

Plaintiff's attendance at the POST academy was a requirement for job advancement at DEP, as it was only subsequent to becoming a certified police officer that Plaintiff "would have been able to work as [a Conservation Enforcement] officer with the Connecticut Department of Environmental Protection."  *Id.* at ¶ 15; *see also, e.g.,* [Doc. 50-2] at 2 (Plaintiff states in his Affidavit that "[a]s a part of [his] job advancement, [he] was required to attend the Connecticut Police Academy to become a certified police officer," and that "[b]y becoming a certified police officer, [he] would be able to work as a Conservation Enforcement Officer with the Connecticut Department of Environmental Protection.")

Indeed, in Defendants' own words:  "[P]ursuant to Conn. Gen. Stat. § 7-294d(a)(5), probationary police officer candidates, such as [Plaintiff], are required to receive basic training necessary to become eligible for certification as a police officer," and thus "must first attend a basic

training program at either the Connecticut Police Academy or at a POST-approved Academy." [Doc. 59] at 9. Under Connecticut law, POST regulates and oversees all police training schools, along with, *inter alia*, the appointment and minimum qualification of instructors at such schools, the nature of the basic training all candidates must meet before being deemed eligible for certification, and the curricula these candidates will study. Connecticut law is clear that "[n]o person may be employed as a police officer by any law enforcement unit for a period exceeding one year unless such person has been certified [by POST] or has been granted an extension by [POST]." C.G.S.A. § 7-294d(a)-(b). Defendants affirm that the Connecticut Police Academy training program in which Plaintiff was enrolled at the time of events relevant to this lawsuit was directly run by POST. [Doc. 43-2] at 1.

Plaintiff avers that during his training at the POST academy, which commenced in March of 2007, his class coordinator Lieutenant Peter Hall "would talk about the Iraq war, terrorism[,] and the Middle East in Plaintiff's presence[, ...] discuss[] how Muslims required their women to wear burqas," and asked Plaintiff whether, "if [Plaintiff] had a daughter[,] [Plaintiff] would ... force her to wear a burqa." *Id.* at ¶¶17-19. Plaintiff also avers that Lieutenant Hall made comments about Muslims being "mostly uncivilized people ... [who] treat[] their women [by] abusing them [and] beat[ing] them," *see* [Doc. 43-5] at 24, and that "[d]uring the first day of classes, the classroom instructors asked ... if there were any Muslims in the classroom," in response to which "[P]laintiff raised his hand and announced that he was Muslim." *Id.* at ¶¶ 20-22; *see also* [Doc. 43-5] at 30 (stating that Lieutenant Hall "ask[ed] in the class ... who is a Muslim – you know, anybody Muslim around here?"). Plaintiff further avers that "[d]uring the first day of classes, the classroom instructors asked about everyone's religion," including whether "there were any Muslims in the classroom." [Doc. 50-2] at 3. Plaintiff states that after he had "raised [his] hand because [he is] a Muslim,"

Lieutenant Hall "then said Muslims were uncivilized and suicide bombers," as well as that they "abuse their women, treat[ing] them like animals." *Id.* Plaintiff states that he believes that he was the only Muslim in his POST academy class. [Doc. 43-5] at 30.

Plaintiff also avers that "[w]hile at the police academy, academy recruits were required to shower nude in the bathroom showers that were not private." [Doc. 1] at ¶¶ 20-22. The basis for Plaintiff's belief that this was an academy policy is that, as he contends, Lieutenant Hall told him that that was the case. [Doc. 43-5] at 31-33. As Plaintiff states, because his "religion prohibits him from being nude in public, ... [he] attempted to shower with an undergarment on," and was informed by Lieutenant Hall that the academy's rules "required that [Plaintiff] shower in the nude." [Doc. 1] at ¶¶ 23-25; *see also* [Doc. 43-5] at 33. Although Plaintiff states he told Lieutenant Hall "that his religious faith prohibited him from doing so," Plaintiff avers that Lieutenant Hall "insisted that [he] shower nude in the [a]cademy bathroom." [Doc. 1] at ¶ 26; *see also* [Doc. 45-5 at 33]. The Court notes that shortly after this conversation, however, Plaintiff was provided with a key to a private bathroom in which he could shower early in the day and later in the evening. [Doc. 1] at ¶ 27; *see also* [Doc. 43-5] at 33-34.

Plaintiff further alleges that another POST academy instructor in whose class Plaintiff was enrolled, Detective Romano Amleto, "would talk about terrorism and suicide bombers" during class; commented at least once that "Arabs are lazy and corrupt;" asked Plaintiff if Plaintiff was Middle Eastern; and when Plaintiff responded that he "was not Middle Eastern but ... Indian[, ...] responded by telling [Plaintiff] that [being Indian] was the same thing [as being Middle Eastern] and that [Plaintiff] was a part of that side of the world." [Doc. 1] at ¶¶ 30-33; *see also* [Doc. 43-5] at 46. In addition, Plaintiff avers that Detective Amleto had stated (presumably in an unpleasantly suggestive

way) that Detective Amleto had taken flying lessons with an Arab, and that Arabs "cheat on ... test[s] to pass." [Doc. 3-5] at 46.

Plaintiff further states that another academy instructor, Captain Noonan, made jokes about Plaintiff running a 7-Eleven and driving a cab, presumably due to Plaintiff's religion, national origin, or race, or some combination thereof, and that on one occasion Captain Noonan had joked that he had spoken with Plaintiff's sister while on a telephone support call routed to a help operator in India. *See, e.g.,* [Doc. 43-6] at 15; [Doc. 50-3] at 17-18 (in which Plaintiff stated that Captain Noonan had said that Plaintiff "should go back and open [a] 7-[Eleven]. This is not [a] job for [Plaintiff].")

The event which directly led to Plaintiff's dismissal from the POST academy, and, accordingly, to the filing of this lawsuit, took place on July 10, 2007. On this date Plaintiff took a multiple choice test which concerned the appropriate medical responses and actions as a first responder. *See, e.g.,* [Doc. 43-5] at 54. This test was one of three which Plaintiff was to take prior to his final exam in a POST academy course, and its score was to be averaged with the scores Plaintiff had received on the first two tests administered in this course, for which Plaintiff reports his median score was "higher than the passing grade." *Id.* at ¶ 47. Plaintiff claims that some of the answers he had marked and then erased on the July 10, 2007 multiple choice test were erroneously graded as his submitted final answers because "the optical scanner" which was used to grade the test papers "did not read [P]laintiff's answer sheet properly." *Id.* at ¶¶ 37-38. Consequently, Plaintiff avers, he then "went ahead and further erased the previously erased answer" – it seems after the test was returned to him graded – and then "showed his answer sheet to the instructor," Detective Amleto, "who looked at [the] answer sheet [and] stated that it was okay and approved [it]," presumably with the answers now fully and accurately reflecting Plaintiff's initially intended

responses.  *Id.* at ¶¶ 38, 43.  Plaintiff reports that issues with the scantron reader were not an uncommon occurrence, as "at least one guy ha[d] a problem in every testing" with the reader's erroneous recognition of erased answers. [Doc. 43-6] at 24.  Plaintiff states that in general when such issues occurred, the impacted recruit would show the exam paper to the instructor, receive permission to correct the mark, and then get credit for it, as Plaintiff avers he did with respect to his July 10, 2007 exam.  *Id.* at 44-45.

Plaintiff avers that when he reported to a classroom to take his final exam in the same POST academy course two days later, he was approached by Lieutenant Hall and Detective Amleto, who asked him whether he had ever cheated on a test.  Plaintiff responded that he had not.  Plaintiff alleges that Detective Amleto then "told [Plaintiff] that he wanted [him] to sit in the front row so that [Detective Amleto] could watch [Plaintiff] while he took the [final exam]," which Plaintiff agreed to do.  Shortly thereafter, however, Lieutenant Hall approached Plaintiff and asked whether Plaintiff "had ever changed an answer to a test question after he received his score," to which Plaintiff states he again responded that he had not, explaining "that on one occasion" a few days prior "where the optical scanner did not read [P]laintiff's intended answer due to the fact that he had erased another answer, [Plaintiff had gone] ahead and further erased the previously erased answer," and that "when he did this he brought the answer sheet to [Detective] Amleto and showed it to him." *Id.* at ¶¶ 39-43.

Plaintiff avers that Lieutenant Hall "then told [Plaintiff] that [Plaintiff had] cheated," and that "Plaintiff was [then] ordered out of the classroom, stripped of his uniform and badge, and thrown out of the [POST] academy."  *Id.* at ¶¶ 44-45; *see also* [Doc. 50-3] at 28-29.  Plaintiff states that he responded: "Sir, I never cheated on any testing," but nonetheless Detective Hall kept repeating that he had.  *Id.* at 29-30.  Plaintiff reports that when he attempted to explain that he was trying to further

7

erase already-erased test answers in order to receive a more accurate test score, which included

further erasing an answer which had in fact been correct, Lieutenant Hall repeated that Plaintiff had

cheated.  Plaintiff avers that he then told the Lieutenant:  "Sir, it's not cheating[,] I didn't change any

answer.  I didn't do anything.  I don't have anything to do," and that Lieutent Hall replied: "No, that

is cheating.  You changed the answer," and left the room smiling.  *Id.* at 32.  Plaintiff states that he

was then forced to change his clothes and pack his belongings, and escorted from the POST academy

campus by Lietenant Hall and another officer, who "walk[ed] behind [Plaintiff ... laughing."  *Id.* at

37.  Lieutenant Hall then allegedly told Plaintiff that if he ever saw Plaintiff again (presumably on

the POST academy campus), Plaintiff would be arrested.  *Id.*  Plaintiff was subsequently formally

dismissed from his position at DEP for, as Defendants phrase it, "failing to complete his working

test period as a result of having been dismissed from the police academy." [Doc. 43-2] at 2.

Defendants give a different accounting of the relevant events.  Their version of the events is

largely reflected in reports filed by both Lieutenant Hall and Detective Amleto concerning

allegations that Plaintiff had cheated on his July 10, 2007 exam.  *See* [Doc. 43-15] and [Doc. 43-16].

Lieutenant Hall's report, dated July 12, 2007, stated:

> On this date at approx. 1130 hrs it was brought to my attention by Detective Romano Amleto
> that he had received information from Class Sergeant Karen Reilly, CT EnCon Police Dept.,
> 315th Training Session, of a possible question of academic integrity by a member of the class,
> one Pathan B. Nadeemdadkhan (Ct EnCon Police Dept.).  According to Detective Amleto,
> Class Sergeant Reilly had informed him that members of the class had informed her that they
> believed Recruit Nadeemdadkhan had changed answers on [a test] while the test was being
> reviewed.
>
> Detective Amleto told me that Recruit Nadeemdadkhan had failed ... test #3 on July 10, 2007
> and that he had not had a chance to check the answers himself before going over the test with
> the class.  Detective Amleto stated that he [had] given the scantron answer sheets back to the
> recruits and was going over the test with the class in preparation for the final exam.  After
> reviewing the test Detective Amleto stated that Recruit Nadeemdadkhan brought to his

attention three questions that he claimed had been answered correctly but had been scored incorrectly by the scantron machine.  As a result of this Recruit Nadeemdadkhan's failing grade of a 67 became a passing grade of 72.

At appx. 1200 hrs. I spoke with Class Sergeant Reilly who stated that she had been informed by members of the class that Recruit Nadeemdadkhan had possibly changed answers on the scantron sheet to give himself a passing grade.  She further stated that no one has said they saw him changing any answers but only [that] they had suspicions of his integrity.  When I asked her who might have witnesses Recruit Nadeemdadkhan [sic] changing an answer, she stated that recruit James Wright sits directly behind him in class and possibly could have seen it.

At approx. 1230 hrs. I invited Recruit Wright into the staff dining room and along with Detective Amleto we questioned him about the above allegations.  Recruit Wright stated at no time had he observed Recruit Nadeemdadkhan changing any answers on an answer sheet or cheating on any exams.

At approx. 1240 hrs. Detective Amleto and I interviewed Recruit Nadeemdadkhan in the Academy Conference room.  Detective Amleto questioned Recruit Nadeemdadkhan about his changing answers on the MRT #3 test and I noted that to each question asked of him by Detective Amleto that Recruit Nadeemdadkhan wasn't answering the question but interrupted the interview asking Detective Amleto to get the scantron sheet in question.  When he returned with the scantron I placed it on the table directly in front of Recruit Nadeemdadkhan and told him I was only going to ask him one question and that I expected him to tell me the truth.  I then asked him if he had changed any answer(s) on this test sheet.  To this question, Recruit Nadeemdadkhan looked me directly in the eyes and stated, "Yes I did Lieutenant, I can[]not lie to you."  He then went on to say he only wanted to get a passing grade.  I told him I was very disappointed in him and that I had told him and the entire class on numerous occasions that cheating would not be tolerated and that we had a serious problem with this.  At this point Recruit Nadeemdadkhan asked if both Detective Amleto and I could give him another chance.  I cut him off mid-sentence telling him not to even go there and he was insulting both Detective Amleto and myself by even thinking we would consider doing such a thing.

I then told Detective Amleto that he needed to get a statement from Recruit Nadeemdadkhan admitting his cheating and that he need[ed] to submit an investigative report in writing himself.  I told Detective Amleto I was going to make Director Rainville aware of this incident and that I would be contacting the recruits department.  As I was leaving I heard Detective Amleto instruct Recruit Nadeemdadkhan to write a statement about this incident and he gave the recruit paper to write on....

... At approx. 1430 hrs. Sergeant Thomas Lewoc and Officer Keith Schneider of CT En Con Police Dept. Arrived at the Academy.  Along with myself the three of us escorted Recruit

9

Nadeemdadkhan to the barracks where Sergeant Lewoc ordered him out of his uniform and took possession of all agency property that had been issued to him. While this was going on Recruit Nadeemdadkhan again admitted in front of Sergeant Lewoc, Officer Schneider and myself to changing answers to get a passing score. He was then escorted to his personal vehicle by myself and Officer Schneider and told once he left the academy grounds he was not to come back on the property again

At approx. 515 hrs Detective Amleto gave me his written report of this incident. At this time I asked about the statement from Recruit Nadeemdadkhan. After Detective Amleto checked his desk where he had instructed Recruit Nadeemdadkhan to leave it, it was determined that Recruit Nadeemdadkhan failed to follow Detective Amleto's orders and did not give a statement.

*See* [Doc. 43-15]; *see also, e.g.,* [Doc. 50-4].

Detective Amleto's written report of the incident, also dated July 12, 2007, stated:

On this date the undersigned along with Lieutenant Hall investigated allegations that Recruit Pathan B. Nadeemdadkhan violated section 4 item 14b (Cheating) of SPECIFIC RULES & REGULATIONS of the Connecticut Police Academy, Recruit Rules & Regulations. The results of the investigation are contained within this report.

At 1130 hrs on this date the undersigned along with Lt. Hall interviewed Recruit James M. Wright. This recruit is seated immediately behind the subject and indicated that [he] at no time observed any academic violations by the subject recruit.

At 1240 hrs the subject recruit Pathan B. Nadeemdadkhan was interviewed. Under direct questioning by Lt. Hall and the undersigned this recruit made admissions that he changed the answer on the scantron answer sheet to question #33 of MRT Exam 3 after the sheet was already graded and while we were going over the exam to review material.

It is my sad duty to report that this recruit by his own admission has violated [the] academic integrity policy of this institution. Please find the original scantron answer sheet attached to this report....

*See* [Doc. 43-16]; *see also, e.g.*, [Doc. 50-5].

Class Sergeant Karen Reilly, who is noted in both Lieutenant Hall and Detective Amleto's accounts, has completed an affidavit with respect to the events underlying this lawsuit. Her statements are in general accord with both Plaintiff's and the POST academy instructors' versions

10

of events; she avers therein that after the relevant test had been reviewed, "several recruits who sat near [Plaintiff] in class came to [her] and expressed their concerns about [Plaintiff] having cheated on the ... exam." [Doc. 43-11] at 3. Class Sergeant Reilly states that these recruits told her that Plaintiff "had erased some answers on the answer sheet during the time Detective Amleto was reviewing the exam," and that these recruits "questioned [Plaintiff's] academic integrity." *Id.* Class Sergeant Reilly states that she then "immediately verbally communicated those concerns to Detective Amleto." *Id.*

On July 16, 2007, four days after Plaintiff had been asked to physically exit the premises of the POST academy, Raymond A. Bouchard, Director of Basic Training at the POST academy, wrote a letter to Plaintiff stating that he had "reviewed the investigation conducted by [Plaintiff's] session coordinator, Lt. Peter Hall," and was "very concerned about this incident" as Plaintiff had "violated one of the basic tenets of Law Enforcement, that of honesty, through [Plaintiff's] attempts to cheat on an ... exam." [Doc. 42-10] at 15. The letter further informed Plaintiff that "[a]s a result of the violation noted [Plaintiff was] being dismissed from the [POST] Academy." *Id.* at 16.

Due to his dismissal from the POST academy, Plaintiff was terminated from his probationary position with DEP. Diane Ragali, then DEP's Principal Human Resources Specialist, states in an affidavit that "[a]s a result of having failed POST's Basic Training, [Plaintiff] failed to obtain his police officer certification and, therefore, became ineligible for permanent appointment as a Police Officer and/or Conservation Enforcement Officer." [Doc. 43-9] at 6. She further explicates that "[d]ismissal from the Connecticut Police Academy results in an automatic termination by [DEP], as the police offiver certification is a mandated requirement for all trainees." *Id.* Accordingly, William L. Evans, Jr., a Chief of Fiscal/Administrative Services at DEP, wrote Plaintiff a letter dated

July 16, 2007 – i.e., the same day as the letter written to Plaintiff by POST academy's Raymond A. Bouchard – which informed Plaintiff that he was "being dismissed from state service due to the failure of [his] initial working test period," and that such "dismissal [would] be effective at the close of business July 16, 2007." [Doc. 43-10] at 16.  This letter further stated that a captain at the POST academy had informed DEP that Plaintiff had been discharged from the academy "for improper conduct," and that "[a]s a Protective Services Trainee" Plaintiff was "required to meet all entrance and graduation requirements of the POST Police Academy."  *Id.*

Plaintiff filed a complaint about the events underlying this lawsuit with the State of Connecticut Commission on Human Rights and Opportunities (hereinafter "CHRO") in January of 2008.  In this complaint, Plaintiff alleged illegal discriminatory practice by both POST and DEP. *See* [Doc. 43-10] at 17.  Equal Employment Opportunity Manager Marcia Z. Bonitto provided CHRO Commissioner Gina McCarthy with an investigative report concerning these allegations roughly two months later, on March 6, 2008.  *See* [Doc. 43-10] at 37.  This investigative report concludes that "[t]here is no evidence to indicate that *DEP staff* acted in any way that would be considered discriminatory towards [Plaintiff]," but notes that Defendant POST "is a state agency independent of DEP," and, as "[t]he acts of discrimination alleged in Mr. Pathan's CHRO complaint occurred under the jurisdiction of the Connecticut Police Academy[, ...] it is that agency's responsibility to investigate those allegations."  *Id.* at 40-41 (emphasis added).  It is not fully clear to the Court why this CHRO investigative report was focused solely upon DEP when Plaintiff's initial CHRO complaint had been made against both DEP and POST.  Nonetheless, as Plaintiff's allegations in the case at bar concern allegations of discrimination which occurred at the POST academy, and not at DEP or directly involving DEP staff, the finding by this CHRO investigative

report that "DEP staff did not act in any way that would be considered discriminatory towards Plaintiff" means little for the purpose of this lawsuit.

While this CHRO investigative report and Ms. Ragali's aforementioned affidavit both state that Plaintiff was informed by DEP that he could contact individuals at DEP to discuss his POST academy dismissal and termination from DEP's employ and present his side of the story, they also say that Plaintiff did not do so. Assuming without finding that Plaintiff did not make contact with his former employer to discuss his concerns, that omission is not conclusive evidence that his allegations concerning discrimination, or his actions surrounding the July 10, 2007 exam and subsequent conversation regarding the same on July 12, 2007 with Lieutenant Hall and Detective Amleto, are inaccurate or untrue.

Essentially, the Court has been giving two different accountings of the July 12, 2007 conversation between Plaintiff and Lieutenant Hall and Detective Amleto. Plaintiff, on the one hand, states that he in no uncertain terms told his POST instructors that he had not cheated on the exam; Lieutenant Hall and Detective Amleto aver that he did. This is, then, one man's word against the word of two other men.

## III.    Standard of Review

The standards for summary judgment are familiar. Summary judgment is appropriate when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." F. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256 (1986). The role of a district court in considering a motion for summary judgment is therefore "not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *In re Dana Corp.*, 574 F.3d 129, 151 (2d Cir. 2009). A party

13

moving for summary judgment bears the burden, on the claims made within that motion, of showing that it is entitled to summary judgment.  Once it has satisfied this burden, the party opposing that particular summary judgment motion "must set forth specific facts demonstrating that there is a genuine issue for trial." *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir 2009) (internal quotation marks omitted).  A dispute about a genuine issue of fact exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

In making its determination on a summary judgment motion, a trial court will resolve all ambiguities and draw all inferences contained within that motion in favor of the party against whom summary judgment is sought.  Fed. R. Civ. P. 56(c); *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 274 (2d Cir. 2009).  It is "[o]nly when reasonable minds could not differ as to the import of the evidence" that summary judgment is proper.  *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991).  When "a motion for summary judgment is properly supported by documentary and testimonial evidence ... the nonmoving party may not rest upon the mere allegations or denials of his pleadings, but rather must present significant probative evidence to establish a genuine issue of fact." *Marczeski v. Gavitt*, 354 F.Supp. 2d 190, 193 (D. Conn. 2005) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 327 (1986)).

In order to present a "genuine issue of material fact" the party opposing a particular motion for summary judgment must therefore present contradictory evidence "such that a reasonable jury could return a verdict for [that] party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248. Consequently that party must present affirmative evidence in order to defeat a properly supported summary judgment motion.  As the "mere existence of some alleged factual dispute between the

14

parties will not defeat an otherwise properly supported motion for summary judgment," *id.* at 247-48, if the party opposing a particular summary judgment motion submits evidence that is "merely colorable," summary judgment may be granted. *Id.* at 249-50.  In sum, a "complete failure of proof concerning an essential element of [that] party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett,* 477 U.S. at 322.

In general, "when ruling on a motion for summary judgment in an employment discrimination case, where intent is at issue, the Court 'affirms judgment in favor of an employer sparingly because careful scrutiny of the factual allegations may reveal circumstantial evidence to support the required inference of discrimination.'" *Bogues v. Town of Trumbull*, 383 F.Supp. 2d 348, 352 (D.Conn. 2005) (quoting *Mandell v. County of Suffolk*, 316 F.3d 368, 377 (2d Cir. 2003)). However, as the Second Circuit has noted, "it is ... beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases," as the "salutary purposes of summary judgment – avoiding protracted, expensive and harassing trials – apply no less to discrimination cases than to ... other areas of litigation." *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001) (citation omitted).  Ultimately, then, "[t]rial courts should not treat discrimination differently from other ultimate questions of fact," *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148 (2000), and "[s]ummary judgment against a plaintiff in an employment discrimination case is appropriate if the plaintiff offers only unsupported assertions, conjecture or surmise, or conclusory statements to support an essential element of her case." *Soderberg v. Gunther Intern., Ltd.*, No. 3:02-CV-02010, 2004 WL 57380 at *4 (D.Conn. 2004) (internal quotation marks and citation omitted).

IV.     **Legal Standard for a Title VII Claim**

Plaintiff's Complaint alleges that Defendants discriminated against him due to race, national origin, and religion in violation of Title VII.   Title VII makes it unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a); *see also, e.g., Jacobs v. Connecticut Community Technical Colleges*, 837 F.Supp. 2d 1, 7 (D.Conn. 2011) (quoting same).   Title VII claims are evaluated and governed by the burden-shifting framework set forth by the United States Supreme Court forty years ago in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *See, e.g., Sample v. Wal-Mart Stores, Inc.*, 273 F.Supp. 2d 185 (D.Conn. 2003).   Under this burden-shifting framework, "a plaintiff must satisfy the minimal burden of making out a prima facie case of discrimination; the burden then shifts to the defendant to produce a legitimate, nondiscriminatory reason for its actions; and the final burden rests on the plaintiff to prove not only that the proffered nondiscriminatory reason was pretextual but also that the defendant discriminated against the plaintiff."  *Slattery v. Swiss Reinsurance America Corp.*, 248 F.3d 87, 91 (2d Cir. 2001) (citing *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143 (2000)).

If "the plaintiff has met this burden of establishing a prima facie case (which is generally not understood by courts to be onerous)," then the defendant must merely "*articulate* (not *prove*), via admissible evidence, a legitimate reason for the employment decision.... At that point, the plaintiff must have the opportunity to demonstrate that the employer's proffered reason was not the true reason for the employment decision," which may be accomplished "either by persuading the trier of fact that a discriminatory reason more likely than not motivated the employer, or by persuading the

trier of fact that the employer's proffered explanation is unworthy of belief." *Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1180-81 (2d Cir. 1992) (internal quotation marks and citations omitted) (emphasis in original); *see also Weichman v. Chubb & Son*, 552 F. Supp. 2d 271, 289-90 (D. Conn. 2008) (applying *McDonnell Douglas* analysis to FMLA retaliation claim).

Specifically applying the *McDonnell Douglas* analytical framework to summary judgment standards in Title VII antidiscrimination cases, the Second Circuit has noted:

> At the summary judgment stage, if the plaintiff presents at least a minimal amount of evidence to support the elements of the claim, the burden of production shifts to the defendant to proffer a legitimate ... reason for the adverse employment action.  If the employer produces such evidence, the employee must, in order to avoid summary judgment, point to evidence sufficient to permit an inference that the employer's proffered ... reason is pretextual.....

*Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 552-53 (2d Cir. 2010), (emphasis added) (quoting *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005)), (internal quotation marks and citations omitted).

As this Circuit has further emphasized in the past, "courts [have] recognized that more than one reason can motivate an employer's adverse action"; thus, when applying a *McDonnell Douglas* analysis, courts have "said that [a] plaintiff had to prove" under the third prong of the analysis – in which a plaintiff must demonstrate that the employer's proffered reason was not the true reason for the employment decision – that the allegedly "impermissible reason, even though not the only reason for an adverse employment decision, was a 'substantial' or 'motivating' factor," or, at the least, "'made a difference' in the decision." *Fields v. New York State Office of Mental Retardation and Developmental Disabilities*, 115 F.3d 116, 120 (2d Cir. 1997) (in discussing the application of the *McDonnell Douglas* analysis to an adverse employment discrimination claim arising under Title VII)

17

(quoting *Sherkow v. Wisconsin*, 630 F.2d 498, 502 (7th Cir. 1980), *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir. 1989) and citing *cf. Paolillo v. Dresser Industries, Inc.*, 865 F.2d 37, 40 (2d Cir. 1989), *as amended,* 884 F.2d 707 (2d Cir. 1989) (addressing this standard as it applies to a court's *McDonnell Douglas* analysis of alleged discrimination under the ADEA)); *see also, e.g., Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166 (same).

"In short," then, "the question becomes whether the evidence, taken as a whole, supports a sufficient rational inference of discrimination.  To the get the jury, '[i]t is not enough ... to disbelieve the employer; the factfinder must [also] believe the plaintiff's explanation of intentional discrimination.'" *Weinstock v. Columbia University*,, 42 (2d Cir. 2000) (quoting *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 519 (1993)).  "In order to survive a motion for summary judgment, at the third step [a] plaintiff must put forth adequate evidence to support a rational finding that the legitimate non-discriminatory reasons proffered by the employer were false, and that more likely than not the employee's [protected status] was the real reason for the discharge."  *Holt v. KMI-Continental, Inc.*, 95 F.3d 123, 129 (2d Cir. 1996) (citing *Viola v. Philips Medical Systems of North America*, 42 F.3d 712, 717 (2d Cir. 1994)).

## V.     Legal Discussion

### A.     Whether Plaintiff May Assert an ADA Claim Against POST

Before the Court delves into an inquiry into the prima facie elements of Plaintiff's Title VII claim, it must first determine which parties are properly within this case.

Defendants aver in support of their summary judgment motion that "[P]laintiff cannot prevail on a Title VII claim against POST because [Plaintiff] did not have an employer-employee relationship with POST for Title VII purposes." [Doc. 43-2] at 3, 10-13.  Plaintiff disagrees, and

avers that POST was indeed his "employer" during the relevant time period for purposes of Title VII. [Doc. 50-1] at 14.

Title VII defines "[t]he term 'employer' [to] mean[] a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current and preceding calendar year, and any agent of such a person...." 42 U.S.C. § 2000e(b).[3]  It defines "[t]he term 'employee' [to] mean[] an individual employed by an employer," with certain exceptions not relevant to the case at bar.  42 U.S.C. § 2000e(f).

No party to this lawsuit disputes either that *Defendant DEP* was Plaintiff's employer in the relevant time period pursuant to Title VII's definition of the term or that Plaintiff was, in turn, DEP's employee for Title VII purposes.  Rather, the Parties' disagreement centers upon whether *Defendant POST* ought *also* to be considered Plaintiff's employer for Title VII purposes in the relevant time period pursuant to Title VII.  This dispute, which might appear chiefly semantic in nature, cuts to the heart of whether Plaintiff may assert a Title VII claim against POST for the events with which this action is concerned.  This is because Title VII provides that "[i]t shall be an unlawful employment practice for an *employer*" –

> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
>
> (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color,

---

[3]   Under Title VII, "[t]he term 'person' includes one or more individuals, governments, governmental agencies, political subdivisions, labor unions, partnerships, associations, corporations, legal representatives, mutual companies, joint-stock companies, trusts, unincorporated organizations, trustees, trustees in cases under Title 11, or receivers." 42 U.S.C. § 2000e(a).

religion, sex, or national origin.

42 U.S.C. § 2000e-2(a) (emphasis added); *see also, e.g.,* [Doc. 43-2] at 10; [Doc. 50-1] at 14.  Thus

for purposes of this lawsuit Defendant POST is only liable under Title VII to the extent to which

Defendant POST may be considered to be Plaintiff's employer for Title VII purposes.  (While two

other subsections of the same statute, i.e., 42 U.S.C. § 2000e-2(b) and (c), address similar restrictions

on the "employment practices" of non-employer employment agencies and labor organizations, these

are categories into which POST clearly does not fall with respect to Plaintiff's claims.)  Notably, a

third subsection of this statute, i.e., 42 U.S.C. § 2000e-2(d), addresses the status of work- or job-

related training programs under Title VII:

> It shall be an unlawful employment practice for any *employer*, labor organization, or joint labor-management committee *controlling apprenticeship or other training or retraining*, *including on-the-job training programs* to discriminate against any individual because of his race, color, religion, sex, or national origin in admission to, or employment in, any program established to provide apprenticeship or other training.

42 U.S.C. § 2000e-2(d) (emphasis added).

Defendants, in support of their position that POST cannot be considered Plaintiff's employer

under Title VII in the relevant time period and that, accordingly, this court must grant summary

judgment with respect to their motion regarding the same, note that Plaintiff "was employed by ...

*DEP*, not by POST," and, moreover, that "it is undisputed that POST neither hired [Plaintiff] nor

compensated him ... Rather, during the period of time relevant to his [C]omplaint, [P]laintiff was a

*trainee* at the POST academy, where *his employer sent him to receive the basic training required*

of [nearly] all probationary police officers employed by any law enforcement unit in the State of

Connecticut." [Doc. 43-2] at 13 (emphasis added).  Thus, Defendants contend, at all times "[w]hile

attending the basic training program, ... [P]laintiff remained an *employee* of DEP and was

20

*compensated* by DEP," receiving "no financial benefit or remuneration from POST." *Id.* (emphasis added).

In an effort to clarify the precise nature of the relationship between Plaintiff's training at POST and his employment with DEP, Defendants aver:  "[P]ursuant to Conn. Gen. Stat. § 7-294d(a)(5), probationary police officer candidates, such as [Plaintiff], are required to receive basic training necessary to become eligible for certification as a police officer," as any "person who is to become a police officer in Connecticut[] must first attend a basic training program at either the Connecticut Police Academy or at a POST-approved Academy." [Doc. 59] at 9.  Under Connecticut law, POST regulates and oversees all police training schools, along with, *inter alia*, the appointment and minimum qualification of instructors at such schools, the nature of the basic training all candidates must meet before being deemed eligible for certification, and the curricula such candidates will study.  "No person may be employed as a police officer by any law enforcement unit for a period exceeding one year unless such person has been certified [by POST] or has been granted an extension by [POST]."  C.G.S.A. § 7-294d(a)-(b).  As noted *supra*, Defendants affirm that the Connecticut Police Academy training program in which Plaintiff is enrolled is directly run by POST. [Doc. 43-2] at 1.

Defendants point both to the relationship between DEP and POST and to the relationship between POST and Plaintiff as evidence that "there was no ... employer-employee relationship between ... POST and ... [P]laintiff," and thus that "POST cannot be subject to liability under Title VII" since "the existence of an employer-employee relationship is a primary element of Title VII claims." [Doc. 43-2] at 10-11 (citing *Gulino v. New York State Education Department*, 460 F.3d 361 (2d Cir. 2006) (internal quotation marks omitted).  In making this argument Defendants rely heavily

on the 2006 Second Circuit decision in *Gulino v. New York State Education Department*, 460 F.3d 361. The Court, however, disagrees with Defendants' reading of the definition of "employer" under Title VII, as well as with Defendants' reading and analysis of the Second Circuit's decision in *Gulino v. New York State Education Department*.

As an initial matter, on its face Title VII includes an employer's *agents* within its definition of the term "employer": "The term 'employer' means a person engaged in an industry affecting commerce ... *and any agent of such a person*." 42 U.S.C. § 2000e(b) (emphasis added). As noted *supra*, Defendants have explicitly averred that "police officer candidates, such as [Plaintiff], are *required* to receive basic training necessary to become eligible for certification as a police officer," and moreover that a "person who is to become a police officer in Connecticut[] *must* first attend a basic training program at either the Connecticut Police Academy or at a POST-approved Academy." [Doc. 59] at 9 (emphasis added). Defendants have also affirmed that the Connecticut Police Academy training program Plaintiff attended was *directly run* by POST. *See* [Doc. 43-2] at 1. Thus according to Defendants' own contentions and description, Plaintiff's attendance at the POST academy was a mandatory requirement both of his continued position as a probationary officer with DEP and of any career advancement Plaintiff might have at DEP. Although the Court will further address this matter *infra*, it is difficult to understand how under such circumstances POST would *not* be considered an agent of DEP with respect to its provision of police officer training to Plaintiff and other similarly situated DEP probationary officers.

The language of Title VII makes clear that Congress intended for agents of employers to be held to the same standards as employers. *See* 42 U.S.C. § 2000e(b). Indeed, and as addressed *supra*, the statute *encompasses* employers' agents within its very definition of "employer." *Id.* Thus the

22

above-quoted Title VII subsection which addresses employment training programs may be read to state in relevant part with respect to Defendant POST:  "It shall be an unlawful employment practice for any [of an *employer's agents*] ... to discriminate against any individual because of his race, color, religion, sex, or national origin in admission to, or employment in, any program established to provide apprenticeship or other training."  42 U.S.C. § 2000e-2(d).

Furthermore, the 2006 Second Circuit decision in *Gulino v. New York State Education Department*, 460 F.3d 361 (2d Cir. 2006), on which Defendants heavily rely in order to argue that POST is not a proper Title VII defendant in the case at bar, *supports* the understanding that POST is DEP's agent under the circumstances at bar, and thus that POST *was indeed* one of Plaintiff's "employers" for Title VII purposes.  In fact, in its *Gulino* decision the Second Circuit explicitly *acknowledges* that "Title VII liability applies to employers *or their agents*," thereby recognizing what is made clear from the text of Title VII:  "that 'any agent' of an employer will be liable for discriminatory behavior."  *Gulino v. New York State Education Department*, 460 F.3d at 378-79 (emphasis in original) (citing 42 U.S.C. § 2000e(b)).[4]  The evidence on record when viewed in light

---

[4]   The Second Circuit there concluded that although no one factor is determinative of whether an agency relationship exists, "the common-law element of control is the principal guidepost that should be followed."  *Gulino v. New York State Education Department*, 460 F.3d at 372-73; *see also, e.g.,* Restatement (Third) of Agency § 1.01 ("Agency is the fiduciary relationship that arises when one person (a "principal") manifests assent to another person (an "agent") that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act.")

The Court notes that much of the agency-related discussion and analysis within *Gulino* on which Defendants largely rely concerns an application of the federal common law of agency to the definition and application of the term "employee" within Title VII – in the words of the Court of Appeals, employing "*traditional indicators of employment* under the common law of agency" in order to "discern[] the existence of an employment relationship" – and thus is not squarely applicable to this Ruling, which in relevant part addresses the Defendants' relationships *with one another* rather than the relationship between Plaintiff and either Defendant.  *See, e.g., Gulino v.*

of the *Gulino* holding as well as other caselaw and the language of Title VII itself make evident that there is *at least* a triable issue of fact as to whether POST, through its academy, was functioning as DEP's agent pursuant to applicable law.[5]

Furthermore, while it is true, as Defendants observe, that the *Gulino* decision narrows the scope of those parties which the Second Circuit recognizes to be within the reach of Title VII liability – including, of course, which parties may be considered agents of a plaintiff's employer(s), and therefore which parties may be considered "employers" in their own right within a Title VII context – the circumstances of this case seem to fit exactly within this narrowed scope.  Notably, in *Gulino* the Second Circuit cited with approval its earlier holding in *Spirt v. Teachers Insurance and Annuity Association*, 691 F.2d 1054 (2d Cir. 1982) *vacated and remanded on other grounds*, 463 U.S. 1223 (1983), in which the Second Circuit had, as described in *Gulino*, "enunciated a narrow rule based upon a unique factual posture ... [and] held that[] *where an employer has delegated one of its core duties to a third party ... that third party can incur liability under Title VII*."  460 F.3d at 377 (emphasis added).  This is, in other words, a particular acknowledgment of the agency principle within a context of Title VII scope and liability.  Thus while the Second Circuit is careful to note the decided *narrowness* of this rule, and while it criticizes the lower court's significantly broader reading

---

*New York State Education Department*, 460 F.3d at 370-73, 379 (emphasis added).

[5]   In *Gulino* the Second Circuit noted the "non-exhaustive, thirteen-factor list of considerations from federal case law and the Restatement (Second) of Agency" which *Guilino* credits to the Supreme Court's holding in *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 751-52 (1989).  While the Court concedes that several of the thirteen facts there listed are not implicated given the factual record in this matter, for the reasoning discussed *infra* it nonetheless holds that the evidence on record, along with the Parties' pleadings, makes evident that there is *at least* a triable issue of fact as to whether POST, through its academy, was functioning as DEP's agent pursuant to applicable law.

thereof, ultimately the Second Circuit accepted and affirmed within its *Gulino* holding that *Spirt* remained good law for those specific circumstances in which *an employer has delegated at least one of its core duties to a third part*y – which is exactly the circumstance in the case at bar with respect to the relationship between Defendant DEP and Defendant Post.   The Second Circuit even "[a]ppl[ied] the appropriately narrow reading of Spirt to the facts of th[e] case before it" in *Gulino*, although given the record before it the court of appeals concluded that in that circumstance there was no factual basis on which it could hold the one of the two defendants was liable under Title VII, precisely because the other defendant – i.e., the party with a direct employment relationship with plaintiff –*"ha[d] not delegated a core employer responsibility*" to its co-defendant, and therefore under those factual circumstances only the plaintiff's direct employer "would be liable under *Spirt*." *Id.* at 377-78.[6]

As the present record makes clear, and unlike those circumstances which existed in *Gulino*, there is no question in the case at bar that Defendant DEP delegated to Defendant POST the responsibility of training some of its employees, and that pursuant to Connecticut law such training was mandatory for such employees' current positions as well as for any potential job advancement within DEP.   The Court notes, moreover, that job training appears to be a core employment duty under Title VII, and, as discussed *supra*, it is specifically singled out within the statute; pursuant to

---

[6]   The *Gulino* opinion specifically addresses and dismisses several more expansive scopes of Title VII liability which were and appear to continue to be permitted by other Circuits. After reciting that "the existence of an employer-employee relationship is a primary element of Title VII claims" under 42 U.S.C. § 2000e-2(a), the Second Circuit stated in *Gulino*: "Absent some evidence that Congress intended otherwise, we conclude that all ... parties" other than those who fall under Title VII's definition of employer, or those which may properly be considered employment agencies or labor unions "are excluded from the Title VII liability scheme."  460 F.3d at 375.  This statement leaves Defendant POST squarely within a definition of "employer" pursuant to Title VII.

42 U.S.C. § 2000e-2(d):

> It shall be an unlawful employment practice for any employer ... controlling apprenticeship or other training or retraining, including on-the-job training programs to discriminate against any individual because of his race, color, religion, sex, or national origin in admission to, or employment in, any program established to provide apprenticeship or other training.

42 U.S.C. § 2000e-2(d) (emphasis added).

Indeed, and as the Second Circuit stated less than a decade ago, "[t]raining is a benefit of employment that receives protection under Title VII." *La Grande v. DeCresente Distributing Co. Inc.*, 370 Fed. Appx. 206, 211 (2d Cir. 2010). The evidence and pleadings on record more than adequately show that Plaintiff's POST "training was 'part of the job' and [that] barring [Plaintiff] from the training diminished his material responsibilities [and] opportunities," as it was *the* direct cause of his employment termination with DEP. *See id; see also, e.g., E.E.O.C. v. Joint Apprenticeship Committee of Joint Industry Board of the Electrical Industry*, 186 F.3d 110, 114 (2d Cir. 1999) (a Title VII case in which the defendant, the Joint Apprenticeship Committee of the Joint Industry Board of the Electrical Industry, administered an "apprentice training program," the "[s]uccessful completion [of which] also entitle[d] an individual to membership in the International Brotherhood of Electrical Workers, Local, 3.")

For example, the Affidavit of Diane Ragali, then Defendant DEP's Principal Human Resources Specialist, states: "[a]s a result of having failed POST's Basic Trianing, [Plaintiff] failed to obtain his police officer certification and, therefore, became ineligible for permanent appointment as a Police Officer and/or Conservation Enforcement Officer." [Doc. 43-9] at 6. A "[d]ismissal from the Connecticut Police Academy results in an automatic termination by [DEP], as the police offiver certification is a mandated requirement for all trainees." *Id.*

26

Given that DEP, Plaintiff's employer, had outsourced Plaintiff's officer training to POST as required by Connecticut law, it is entirely consistent both with the Second Circuit's decision in *Gulino* and with the language of Title VII to consider POST a liable party under Title VII for purposes of this action. Accordingly, in light of the Second Circuit's explicit acknowledgment and affirmation of the narrow rule articulated in *Spirt* within its 2006 *Gulino* holding, and resolving all ambiguities and drawing all inferences in Plaintiff's favor as the Court must in making a determination on Defendants' summary judgment motion, *see, e.g.,* Fed. R. Civ. P. 56(c); *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. at 587, the Court finds that there is *at minimum* a genuine issue of fact as to whether DEP delegated what is presumably a core duty under Title VII – i.e., the training of its employee police officers – to POST when it required such employees to attend POST-run academies.[7]  For the reasons articulated *supra*, the Court declines to dismiss

---

[7]  Despite its acknowledgment of the narrow *Spirt* rule, the Second Circuit's 2006 opinion in *Gulino* heavily throws into questioning the status of other decisions on which Plaintiff relies, namely *Pompeii v. Alexander Manufacturing, Inc.*, No. 3:03-CV-01170, 2003 WL 22682337 at *1 (D.Conn. Nov. 7, 2003), which held that in instances in which a plaintiff bringing a Title VII action "does not allege that [a defendant] was [the plaintiff's] direct employer, the question is whether [that] plaintiff has alleged facts sufficient to raise the possibility that [the defendant] was [the plaintiff's] 'employer' [under the statute] in the broader sense of significantly affecting [the plaintiff's] access to employment opportunities." *Pompeii v. Alexander Manufacturing, Inc.*, No. 3:03-CV-01170, 2003 WL 22682337 at *1 (D.Conn. Nov. 7, 2003). As the district court there explained, "Title VII primarily covers relations between employees and their employers *or their employers' agents*, not between employees and third parties," *id.* (emphasis added) (citing *Los Angeles Department of Water & Power v. Manhart*, 435 U.S. 702, 718 (1978)); accordingly "the term 'employer,' as it is used in Title VII, is sufficiently broad to encompass any party who significantly affects the access of any person to employment opportunities, regardless of whether that party is the 'employer' of the person as that term has been defined at common law," and "[a] defendant can be considered a plaintiff's 'employer' if the plaintiff alleges that the defendant had authority to ... at a minimum[] affect [the plaintiff's] employment with [his or her] direct employer in some way." *Id.* (citing *Spirt v. Teachers Insurance & Annuity Association*, 691 F.2d 1054).

To the extent, however, that these cases are still good law:  If completing and passing the

Defendant POST from this case.

**B.     Plaintiff's Prima Facie Case**

In order to set forth a prima facie case of employment discrimination under Title VII, Plaintiff must show that he: (1) is a member of the protected class; (2) was qualified for his position; (3) suffered an adverse employment action; and (4) this adverse employment action occurred under circumstances giving rise to an inference of discrimination. *Sample v. Wal-Mart Stores*, 273 F.Supp. 2d at 188.  As this Circuit has noted, under the *McDonnell Douglas* burden-shifting paradigm the "qualification necessary to shift the burden to defendant for an explanation of the adverse job action is minimal...."  *Slattery v. Swiss Reinsurance America Corp.*, 248 F.3d at 92 (citation omitted); *see also, e.g., Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 76 (2d Cir. 2005); *Zimmermann v. Assocs.*

---

POST training program and receiving certification of the same was a requirement for Plaintiff's continued employment and career prospects with DEP, then POST without doubt had at minimum significant "influence over the existence and terms of [his] employment" with DEP; in truth, and as the record more than adequately shows in order to survive a motion for summary judgment on this issue, the nature, terms, and ultimately existence of Plaintiff's employment with DEP were at least in significant part *dependent* upon Plaintiff's success with the POST training program.  *See Pompeii v. Alexander Manufacturing, Inc.*, 2003 WL 2337 at *1; *see also, e.g., Kern v. City of Rochester*, 93 F.3d 38 (2d Cir. 1996) (noting that a Title VII plaintiff had, among other things, "fail[ed] to allege that her employment ... was affected by [a prospective defendant] in any way," and thus concluding that without such allegations "the district court [had] properly denied [her] motions to amend her complaint to add a Title VII action against [that prospective defendant].")

However, while Plaintiff has more than sufficiently alleged – and the evidence more than sufficiently demonstrates – that POST had the authority and ability to affect Plaintiff's employment with DEP, and furthermore, while, Defendants have concurred with this position, *see* [Doc. 43-2] at 13 (emphasis added), given its doubt about the standards set forth by these decisions post-*Gulino*, the Court will not and does not deny summary judgment for such a reason or under such considerations.  *See Gulino v. New York State Education Department*, 460 F.3d at 373-76, 378-79 (addressing the inapplicability in this Circuit of either the "interference" theory of employer liability under Title VII as well as two other theories of indirect employer liability: (1) the single or joint employer test and (2) the instrumentality test).

*First Captial Corp.*, 251 F.3d 376, 381 (2d Cir. 2001).  Notably, for the purpose of their Motion for

Summary Judgment Defendants do not contend that Plaintiff cannot plead sufficient facts in order

to establish a prima facie case of discrimination pursuant to Title VII; rather they state that they "will

assume *arguendo* that [Plaintiff] has [pled] sufficient facts and sustained his ... burden of

demonstrating a prima facie case." [Doc. 43-2] at 13 (some emphasis omitted).

Plaintiff nonetheless avers in his opposition to Defendants' Motion for Summary Judgment

that he can establish a prima facie case:

> The first prong is met because [Plaintiff], as an Asian, Indian, and Muslim, belongs to a
> protected class.  The second prong is met because [Plaintiff] had already been hired by ...
> DEP and was a sworn officer with ... DEP and was required to attend POST for additional
> training to become a certified officer.  The third prong is met because [P]laintiff was thrown
> out of the police academy and was terminated by ... DEP.  The fourth prong can be met by
> the evidence of the discriminatory comments regarding [Plaintiff's] race, national origin[,]
> and religion, as well as the treatment regarding showering that [P]laintiff was subjected to.

[Doc. 50-1] at 19.  Given the factual record of this case the Court concurs with Plaintiff's assertions

in such regard, and again notes that this Circuit has repeatedly held that the burden in establishing

a prima facie Title VII discrimination case is minimal.  *See, e.g., James v. New York Racing

Association*, 233 F.3d 149, 156 (2d Cir. 2000); *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126

(2d Cir. 2006).

### C.     Defendant's Proffering of a Legitimate and Non-Discriminatory Reason for Plaintiff's Termination and Other Adverse Employment Actions

As noted *supra*, if a plaintiff "has met this burden of establishing a prima facie case," a

defendant must merely "*articulate* (not *prove*), via admissible evidence, a legitimate reason for the

employment decision."  *Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1180-81 (2d Cir. 1992)

(internal quotation marks and citations omitted) (emphasis in original); *see also Weichman v. Chubb*

*& Son*, 552 F. Supp. 2d 271, 289-90 (D. Conn. 2008) (applying *McDonnell Douglas* analysis to FMLA retaliation claim).   "This burden is one of production, not persuasion; it can involve no credibility assessment."  *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142 (2000).

Here, Defendants contend that they "have met their burden of articulating a legitimate non-discriminatory reason for their decisions," as "POST dismissed ... [P]laintiff from the police academy after it had determined that [he] had changed answers on a test score sheet after it had been graded in order to achieve a passing grade, a major violation of academy rules and regulations," and "DEP then dismissed [Plaintiff] from his position with that agency because [he had] failed to complete the basic training program required for certification as a Protective Services Trainee."  [Doc. 43-2] at 14.   Defendants further state that the "Connecticut Police Academy's Recruit Rules and Regulations provide, in relevant part, that '[c]heating, plagiarism and/or conspiring with others to cheat or falsely report academic grades or proficiency skill levels shall constitute a major infraction of Academy Rules and Regulations and may result in immediate dismissal from the Academy.'"  *Id.* at 17.  Plaintiff was provided with a copy of these rules.  *Id.*

Since Defendants' burden in this second prong of the three-pronged *McDonnell Douglas* test is *merely to articulate, and not to prove*, a legitimate non-discriminatory reason for Plaintiff's dismissal from the POST academy and his subsequent termination from his position with DEP, it is apparent that Defendants have met that burden.

### D.   Whether Plaintiff Has Demonstrated that Discrimination Was a Motivating Factor

"Because the Defendant[s] ha[ve] articulated non-discriminatory reasons for [their] conduct, the *McDonnell Douglas* framework – with its presumptions and burdens – disappear[s], ... and the

sole remaining issue [is] discrimination *vel non*...." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. at 142-43.  Accordingly, "Plaintiff must now point to evidence that reasonably supports a finding of prohibited discrimination, i.e., that the [Defendants'] proffered non-discriminatory reasons are merely pretext for wrongful discrimination." *Wilks v. Elizabeth Arden, Inc.*, 507 F.Supp. 2d 179, 194 (D.Conn. 2007).  In order to do so, Plaintiff must "present evidence from which a fact-finder could reasonably conclude that [Defendants'] reason was pretextual and that the real reason was discrimination." *Brennan v. Metropolitan Opera Ass'n, Inc.*, 192 F.3d at 317.  "Pretext is evaluated on a case-by-case basis," and "[a]n employer [is] entitled to judgment as a matter of law if the record conclusively reveals some other nondiscriminatory reason for the employer's decision, or if the plaintiff creates only a weak issue of fact as to whether the employer's reason was untrue and there [is] abundant and uncontroverted independent evidence that no discrimination had occurred." *Bogues v. Town of Trumbull*, 383 F.Supp. 2d 348, 356 (D. Conn. 2005) (quoting *Reeves v. Sanderson Plumbing Prod. Inc.*, 530 U.S. 133, 143, 148 (2000)).

In a Title VII burden-shifting framework "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated ... remains at all times with the plaintiff" and "once the employer has proffered its nondiscrimnatory reason, the employer will be entitled to summary judgment ... unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination." *James v. New York Racing Association*, 233 F.3d at 154 (internal quotation marks and citations omitted).  "The plaintiff must produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendnt[s] were false, and that more likely than not discrimination was the real reason for the employment action ... To get to the jury, it is not enough ... to disbelieve the employer; the factfinder

must also believe the plaintiff's explanation of intentional discrimination." *Rajaravivarma v. Board of Trustees for the Connecticut State University System et al.*, 862 F.Supp. 2d 127, 147 (D.Conn. 2012) (quoting *Weinstock v. Columbia University*, 224 F.3d 33, 43 (2d Cir. 2000); *see also, e.g., Barker v. Ellington Board of Education*, No. 3:12-CV-00313, 2013 WL 6331159 at *11 (D.Conn. Dec. 5, 2013) (quoting same). "[A] factfinder's disbelief of a defendant's proffered rationale may allow it to infer the ultimate fact of intentional discrimination in some cases." *Barker v. Ellington Board of Education*, 2013 WL 6331159 at *11 (internal quotation marks and citation omitted).

Notably, as the Second Circuit has stressed, while "there are sentences in some opinions to the effect that a Title VII plaintiff must prove *both* that the [defendant's proffered] reason was false[] *and* that discrimination was the real reason, ... these decisions do not require a finding of pretext in addition to a finding of discrimination;" rather, "they make the quite different point that a Title VII plaintiff may not prevail by establishing only pretext, but must prove, in addition, that a motivating reason was discrimination." *Fields v. New York State Office of Mental Retardation and Developmental Disabilities*, 115 F.3d 116, 121 (2d Cir. 1997) (emphasis in original) (citations and internal quotation marks omitted).  Thus "though a plaintiff may not prevail only by showing that a proffered explanation is not pretext, it is not required to make such a showing." *Id.*  Ultimately "[s]ince a plaintiff prevails by showing that discrimination was *a* motivating factor, it can invite the jury to ignore the defendant's proffered legitimate explanation and conclude that discrimination was a motivating factor, whether or not the employer's proffered explanation was also in the employer's mind." *Id.* (emphasis in original); *see also Henry v. Wyeth Pharmaceuticals, Inc.*, 616 F.3d 134, 156 n.5 (2d Cir. 2010) ("We ... addressed this point in *Fields v. New York State Office of Mental Retardation & Developmental Disabilities* ... Notwithstanding out admonition in *Fields*, district

courts in the intervening years have continued to instruct juries that pretext is, in effect, a required element of plaintiff's claim which must be proved by a preponderance of the evidence. Plaintiff has *no such burden*; in all cases, plaintiff sustains his burden if he proves that an adverse employment decision was motivated by discrimination, regardless of whether he is able to additionally show that the employer's asserted justification for the decision was 'pretextual.'") (emphasis in original).

Expanding on this theme, the Second Circuit said in *Henry*, 616 F.3d 134 at 157, that "[t]o require a plaintiff to prove that the employer acted with conscious intent to deceive as to its reasons imposes a burden not envisioned by [Title VII]," and continued:

> There are many circumstances in which a jury may justifiably find a prohibited discriminatory motivation notwithstanding a different explanation given by the employer in good faith without intent to deceive. *One such circumstance exists where the adverse decision is made by two or more persons, some of whom are motivated by discrimination, while others are motivated by other reasons, and the employer's innocent explanation emanates from those who had no discriminatory motivation and were unaware of their colleagues' discriminatory motivation.* In such cases, the explanation given by the employer will be based on incomplete information, but not an intent to deceive.

(emphasis added).

In the set of circumstances before this Court, Plaintiff avers that he did not cheat on the July 10, 2007 exam in question, and that he repeatedly told this to his POST academy supervisors, i.e., Lieutenant Hall and Detective Amleto, when asked on July 12, 2007. Lieutenant Hall and Detective Amleto, however, aver both that Plaintiff did cheat on this exam and that Plaintiff verbally admitted having done so at least twice. The Court is consequently faced with what is essentially one individual's word against two other individuals' words.

Plaintiff's pleadings and deposition testimony extensively address his allegations concerning discriminatory remarks made by Lieutenant Hall and Detective Amleto, among other POST academy

33

instructors.   These alleged remarks concerned Plaintiff's race, religion, and national origin. Lieutenant Hall and Detective Amleto are also the individuals who reported that Plaintiff admitted to cheating on the exam in question on July 12, 2007 and, indeed, they are the only two individuals whose testimony Defendants have proffered in order to provide direct support for this claim despite averments that two other individuals, i.e., DEP employees Sergeant Lewoc and Officer Schneider, also heard Plaintiff admitting to cheating. *See, e.g.,* [Doc. 43-15].  While Sergeant  Lewoc, for example, states in an affidavit that Plaintiff "admitted to [Lewoc] that [Plaintiff] changed answers on an exam," *see* [Doc. 43-12] at 3, Plaintiff does not deny that he did this; he merely denies that in doing so he was attempting to or in actuality *cheating*.  Defendants also acknowledge that the individual with the best view of Plaintiff during the events in question, Recruit James Wright, "stated at no time had he observed [Plaintiff] changing any answers on an answer sheet or cheating on any exams," and that Class Sergeant Karen Reilly, who first brought the possibility of Plaintiff's cheating to Lieutenant Hall and Detective Amleto's attention, had merely stated in so-doing that "members of the class had informed her that they believed Recruit Nadeemdadkhan had changed answers on [a test] while the test was being reviewed," *see id.* – a fact which, again, Plaintiff does not dispute and has never disputed.

Title VII provides that "[i]t shall be an unlawful employment practice for an employer" or for an employer's agents, who as discussed *supra* are also considered to be a plaintiff-employee's "employers" pursuant to the language of the statute:

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way

which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a) (emphasis added).  The statute also provides that:

It shall be an unlawful employment practice for any employer [or an agent of that employer] ... controlling apprenticeship or other training or retraining, including on-the-job training programs to discriminate against any individual because of his race, color, religion, sex, or national origin in admission to, or employment in, any program established to provide apprenticeship or other training.

42 U.S.C. § 2000e-2(d) (emphasis added).

As the Court has noted *supra*, it is appropriate for a court to grant summary judgment when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." F. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 256. The role of a district court in considering a motion for summary judgment is thus "not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *In re Dana Corp.*, 574 F.3d at 151.  A dispute about a genuine issue of fact exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 252.  In making its determination on a summary judgment motion, a trial court will resolve all ambiguities and draw all inferences contained within that motion in favor of the party against whom summary judgment is sought. Fed. R. Civ. P. 56(c); *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 274 (2d Cir. 2009).  It is "[o]nly when reasonable minds could not differ as to the import of the evidence" that summary judgment is proper.  *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991).  Resolving all ambiguities and drawing all inferences in favor of Plaintiff as it must for purposes of summary judgment, the Court

35

concludes that Plaintiff has provided sufficient evidence for a reasonable trier of fact to conclude that discrimination was a motivating factor in Plaintiff's dismissal from the POST academy and subsequent termination from DEP's employ.

The Court also concludes that Plaintiff has provided sufficient evidence to allow a reasonable jury to find that Defendants' stated reason for these adverse employment actions was a pretext for unlawful discrimination. *See, e.g., Feingold v. New York*, 366 F.3d 138, 157 (2d Cir. 2004). The remarks pertaining to Plaintiff's race, national origin, and religion, which Plaintiff unequivocally ascribes to the only two witnesses (Lieutenant Hall and Detective Amleto) Defendants put forth to directly support Defendants' contention that Plaintiff admitted to cheating on his July 10, 2007 exam, rise well above isolated remarks of seeming bias or enmity. Rather, the comments Plaintiff says Lieutenant Hall and Detective Amleto made constitute a series of opprobrious comments of the sort which would support a claim for creation of a hostile work environment. That element must be viewed together with the directly conflicting accounts of the July 12, 2007 conversation: Lieutenant Hall and Detective Amleto say Plaintiff confessed to cheating, Plaintiff says he did not do so. A reasonable jury could accept Plaintiff's account. Plaintiff has pointed to sufficient evidence to create a triable issue with respect to pretext.

To pursue that subject somewhat further, the discriminatory remarks alleged by Plaintiff to have been made by Lieutenant Hall and Detective Amleto (which are largely unaddressed in Defendants' submissions) create the permissible inference that Hall and Amleto may have acted with animus toward Plaintiff: stating that Plaintiff had admitted cheating when in fact Plaintiff had not done so, thereby deliberately causing the adverse employment action at issue, i.e., Plaintiff's forced exit from the POST academy and subsequent termination from his employment position with DEP.

36

Accordingly, the record of this lawsuit does not provide "abundant and uncontroverted independent evidence that no discrimination had occurred." *Bogues v. Town of Trumbull*, 383 F.Supp. 2d at 356 (quoting *Reeves v. Sanderson Plumbing Prod. Inc.*, 530 U.S. 133 at 148).  I think it important to emphasize that, in voicing this analysis, the Court neither makes nor intimates any view about the integrity or conduct of Lieutenant Hall or Detective Amleto.  That is not a trial court's function on a motion such as this one.  This Court's proper function is to decide whether, in the totality of circumstances, the case should be allowed to proceed to a trial, where a jury will decide the genuine issues about material facts.  That must occur in the case at bar.

Two additional observations are appropriate.  First, the Court notes the possibility that this is a case where the explanation proffered by several of those individuals associated with DEP and POST who were involved with Plaintiff's adverse employment actions – i.e., that they believed Plaintiff had cheated on his exam – was given in "good faith [and] without intent to deceive."  *See Henry v. Wyeth Pharmaceuticals, Inc.* 616 F.3d at 157.  However, the Court concludes that on the basis of this record, there is a triable issue of fact as to whether Plaintiff's dismissal from the POST academy and subsequent termination from his probationary employment with DEP was also made in part by individuals who *were* – for purposes of this summary judgment adjudication – credibly "motivated by discrimination."  In consequence, a jury must make a factual determination as to whether it finds "a prohibited discriminatory motivation notwithstanding."  *Id.*

Second, if one accepts (as the jury could permissibly find) that Lieutenant Hall and Detective Amleto made the discriminatory remarks with respect to Plaintiff's race, national origin, and religion that Plaintiff ascribes to them, there is the added possibility that there may have been some ambiguity in the participants' minds as to whether Plaintiff merely affirmed on July 12, 2007 that he only

37

altered exam answers for innocent reasons, or actually confessed that he had cheated. If that is what occurred, the case may present a circumstance "where the decisionmaker is unaware of his own discriminatory motivation and may believe in good faith that his different explanation honestly accounts for the decision, without awareness of the extent to which his judgments are influenced by ingrained discriminatory attitudes which have been proved to the jury." *Henry*, 616 F.3d at 156 n.6. That is to say, Lieutenant Hall and Detective Amleto may have misunderstood Plaintiff's words for an admission of wrongdoing because of their own innate biases and ingrained discriminatory attitudes. In defining the possible boundaries of a trial, the Court intimates no view as to whether these particular facts took place.

Given the record in this case, and the standards applicable to a motion for summary judgment, the Court holds that Plaintiff has "present[ed] evidence from which a fact-finder could reasonably conclude that [Defendant's] reason was pretextual and that the real reason was discrimination." *Brennan v. Metropolitan Opera Ass'n, Inc.*, 192 F.3d at 317. Here, Plaintiff has not simply produced "some evidence;" rather, Plaintiff has produced "sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant[s] were false, and that more likely than not discrimination was the real reason for the employment action." *Rajaravivarma v. Board of Trustees for the Connecticut State University System et al.*, 862 F.Supp. 2d 127, 147 (D.Conn. 2012) (quoting *Weinstock v. Columbia University*, 224 F.3d 33, 43 (2d Cir. 2000); *see also, e.g., Barker v. Ellington Board of Education*, No. 3:12-CV-00313, 2013 WL 6331159 at *11 (D.Conn. Dec. 5, 2013) (quoting same). In short: the record contains no evidence that Plaintiff had cheated on his exam besides testimony solely provided by Lieutenant Hall and Detective Amleto. Defendants have produced no additional witness who testifies in direct support

of their contentions that Plaintiff admits that he cheated on the exam rather than merely changed answers on the scantron sheet.  Plaintiff avers that he did not cheat.  These are factual issues that militate against summary disposition.

Discriminatory remarks are alleged to have been made toward Plaintiff by Lieutenant Hall and Detective Amleto.  Those remarks preceded the examination-correcting incident which triggered Plaintiff's termination.  A jury could reasonably find that these remarks revealed a discriminatory mind set on the part of the speakers which caused them, perhaps unconsciously, to view the circumstances of the exam incident, and to construe Plaintiff's explanation of it, in a manner adverse to Plaintiff, and consistent with the discriminatory animus these officers seem, by the evidence of their remarks, to have harbored.

## VI.    Conclusion

There are factual issues in this case which are not appropriate for summary disposition.  If certain of those issues are resolved in Plaintiff's favor by a trial jury, Defendants will be liable to Plaintiff under Title VII.

For the forgoing reasons, Defendants' Motion for Summary Judgment [Doc. 43] is DENIED in its entirety.

It is SO ORDERED.

Dated:  New Haven, Connecticut
        May 15, 2014


                                    /s/ Charles S. Haight, Jr.
                                    Charles S. Haight, Jr.
                                    Senior United States District Judge


39